# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 25, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-0496-MR

BRYAN GREENWELL                              APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.        HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
NO. 16-CR-002034

COMMONWEALTH OF KENTUCKY                 APPELLEE

AND

## 2018-SC-0682-MR

JODIE CECIL                                  APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.        HONORABLE JUDITH MCDONALD-BURKMAN, JUDGE
NO. 16-CR-002034

COMMONWEALTH OF KENTUCKY                 APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Bryan Greenwell was found guilty of murder, attempted murder, and tampering with physical evidence and was sentenced to life imprisonment. Greenwell's co-defendant, Jodie Cecil, was convicted of complicity to murder and complicity to attempted murder and was sentenced to twenty years'

imprisonment.  Greenwell and Cecil now appeal their convictions to this Court as a matter of right.[1]

## I.  FACTUAL BACKGROUND

Cecil's sole assertion of error concerns the sufficiency of the evidence against her.  A thorough recitation of the underlying facts is therefore necessary.

On May 13, 2016, Jennifer Cain was supposed to report to her new job at noon.  Jennifer got the job through her good friend Tanya Taylor's fiancé Robert Hayes.  Robert also happened to be the head of maintenance for the apartment building Jennifer lived in with her boyfriend Darrell Wilson.  The apartment building contained only two apartments: one apartment was occupied by the appellants Greenwell and Cecil, while the other was occupied by Jennifer and Darrell, the victims in this case.

Tanya became concerned on the morning of the 13th because she had not been able to contact Jennifer.  Tanya therefore asked Robert to go to Jennifer's apartment and check on her.  Robert went to the apartment around noon and knocked on Jennifer's apartment door, but no one answered, so he left.  By that evening Tanya still had not heard from Jennifer, so she and Robert went back to the apartment building.  Robert again received no response when he knocked on Jennifer's apartment door.  But he found that

---

[1] Ky. Const. § 110.

2

the door was unlocked, so he opened it and stepped in. The apartment was relatively small, and the door opened into a living room and kitchen area. The sole bedroom in the apartment was to the right, and the entrance to the bedroom was between the living room and kitchen. From the doorway Robert could see Darrell lying on the bed in the bedroom, Darrell was unresponsive to Robert calling out to him. Robert therefore stepped into the apartment a little further and saw Jennifer on the bedroom floor between the foot of the bed and a dresser. Robert saw Darrell take a shallow breath and immediately called 911. As will be discussed in more detail *infra*, Jennifer had been shot in the head three times, and Darrell had been shot in the head once. Jennifer was pronounced dead at the scene, but Darrell was rushed to the hospital and, miraculously, survived.

Robert testified that after the shootings he went to Greenwell and Cecil's apartment twice, both times with police officers present. The first time was out of concern that whoever killed Jennifer and shot Darrell may have also attacked Greenwell and Cecil. Robert said that the first time he went into the apartment it looked "lived in," but Greenwell and Cecil were not there. The second time he went, several days later, much of the clothing and personal items that were there previously were now gone and, in his opinion, it looked like someone "left in a hurry."

Due to the severity of Darrell's brain injury he was unresponsive for about a month after the shooting. But by the end of June, Darrell's condition had improved. He was paralyzed from the neck down and was unable to

3

speak, but he was able to understand questions and respond to them by mouthing words, nodding, blinking, and furrowing his brow. The lead detective on the case, Det. Brian Royce, interviewed Darrell on June 20 at a care facility. Again, Darrell was not able to speak, so Det. Royce had to interpret Darrell's non-verbal responses the best he could. From this interview Det. Royce discerned that Greenwell and Cecil were Darrell's neighbors and that they were responsible for the shootings. Det. Royce also believed that Darrell gave him an affirmative response when he said, "So you [and Jennifer] were in a domestic situation, they stepped in, you guys kind of turned from fighting with each other to arguing with them and it escalated. Does that sound right?" However, Det. Royce was not able to determine who shot Jennifer and Darrell or which of the two victims was shot first.

Investigators were finally able to locate Greenwell and Cecil in mid-July, and Det. Royce interviewed them both, separately, on July 19.

Cecil was interviewed first. Det. Royce said that Cecil was normal, chatty, and upbeat when the interview began. When Det. Royce asked her about the shootings, she said she heard about it on the news, but denied any involvement. She said she had not been to her apartment for two days prior to the shootings, though she did return to her apartment a few days after they occurred. She also offered some speculation to Det. Royce about what may have happened. Cecil said perhaps Darrell shot Jennifer or vice versa, though she personally believed that whoever shot them were actually looking for her. This was in some way related to Cecil's involvement in narcotics.

4

Det. Royce then showed her the video of his interview with Darrell. This was the first time Cecil learned that Darrell had survived, as that information had not yet been made public. Det. Royce said that upon seeing the video Cecil's demeanor changed from jovial to scared and worried. Her story likewise changed. She now said that in the week leading up to the shootings Jennifer and Darrell had been physically violent with each other and both had black eyes. Cecil said that on the morning of the shootings Jennifer wanted Darrell to leave her apartment, but he would not, and Jennifer was scared to leave him there and to go to work. Cecil said that she and Greenwell went over to Jennifer's apartment, and Darrell and Jennifer were in the bedroom fighting. Greenwell walked into the apartment, while Cecil remained in the doorway and Cecil soon heard a pop. She said Jennifer was shot first, and then the gun went off again while Greenwell and Darrell were wrestling for it. She said she stood in the doorway of the apartment throughout the incident. She acknowledged that from the doorway she could see Darrel's body on the bed and that it was shaking. She claimed to have only heard two shots, and she admitted that the gun used in the shootings was Greenwell's.

Cecil said that after the shootings she and Greenwell immediately got dressed and left without taking any of their belongings. They then went to a casino for five to six hours "just to try to be somewhere." They returned to her apartment three to four days later during the night, got some clothes, and never returned.

Det. Royce then interviewed Greenwell. First, Greenwell said he had heard about the shootings but denied any involvement. He claimed that whoever shot Jennifer and Darrell were probably sent there to shoot him and Cecil. Specifically, that a man named Terry Payne "was supposed to send some people from Chicago, some black dudes, [and] said it's not about the money now, it's not about the dope, it's about the principle...and that some people from—what he say, New Orleans or something like that, fucking Louisiana is up looking for [Cecil]." Det. Royce then showed Greenwell the video of Darrell, at which point Greenwell became scared and changed his story. The transcript from this portion of Greenwell's interview reads:

> **Greenwell:** [Jennifer] came over there she said [Darrell] is over there beating on me. So we walked over there, we didn't even walk in the apartment at first. I was like, you know, what's going on. [Cecil] didn't go over there at first she was like we can, you go over there see if you could just (inaudible). I said yeah, you know, so I walked over there. [Darrell] was over there breaking shit, throwing shit, cussing [Jennifer]. All three of us was standing outside, he was—[Jennifer] was standing outside. I was like look just leave or come over here do something, just if you wanna (inaudible)—call the cops. [Jennifer] went back inside, [Darrell] grabbed a hold of her or something like that and that's—Jodie was like you know you gotta help her...so I walked in there, and I separated them and this and that. And that's when, to be honest with you, I don't even—I can't even remember if how the gun came into play, for real. Well we started, kind of wrestling around and the gun went off. And then went off again, and that's—
>
> **Detective:** How many times do you think it went off?
>
> **Greenwell:** Honestly, man I don't even know. I was—I mean I was blacked out or something like that. I don't know, man, it's like I'm guessing two or three times. Three, something like that. I remember hearing three gunshots.
>
> **Detective:** Do you remember which one you shot first?

6

**Greenwell:** No.  Honestly I don't.  I mean, cause I was—I freaked out.  I was like man what the fuck I came over to help somebody, and this shit happens.  I think (long pause) I know it went off once, I'm thinking she got hit first.  I'm not for sure, and then me and him was still struggling and it went off again.  I do remember that.  And that's when he fell on the bed, and I was, I didn't, I mean I didn't know what to do.

During his interview, Greenwell never told Det. Royce that he felt his life was in danger or that he acted in self-defense.  He also never said that Darrell had a gun or that Darrell was the one who shot Jennifer.  He claimed that he took his gun with him because he thought people were after him and Cecil.  He told Det. Royce that after the shootings he melted down the barrel of the gun he used and gave the rest back to its original owner.  Greenwell and Cecil were both arrested following their interviews.

Det. Royce later discovered that Greenwell's claim about destroying the gun he used was not true.  On August 23, the gun, a .40 caliber Taurus semiautomatic handgun, was recovered from a pond in Jefferson Memorial Forest.  The magazine was also recovered from the pond separately from the gun.

At trial, Dr. Jeff Springer, the medical examiner, testified to the nature of Jennifer's injuries.  As noted, Jennifer was shot in the head three times.  One bullet entered just below her left earlobe and traveled up from left to right and exited behind her right ear; Dr. Springer noted that this wound had stippling, i.e. unburned gunpowder, and therefore had to have been fired between 1 centimeter and 36 inches away.  A second bullet entered just below her left eye and traveled down from left to right and exited the right side of her neck; this

7

wound also had stippling and likewise was fired between 1 centimeter and 36 inches away. A third bullet entered the left side of her skull slightly above her ear and traveled down from left to right and exited through her right cheek; Dr. Springer testified that this wound had no evidence of stippling or soot and was therefore fired from an indeterminate distance, but he noted that hair can sometimes absorb gunpowder. The bullet that entered below her left eye would not have been fatal, apart from possible exsanguination. The other two shots would have been individually lethal. In addition, Det. Royce determined that,

based on the blood cast off pattern on a computer tower next to Jennifer's body, Jennifer was on the floor next to that tower when at least one of the shots was fired. This conclusion was bolstered by a spent shell casing found near the left side of her head which indicates that the weapon was fired in that vicinity, as well as the projectile recovered from inside the computer tower. But, Det. Royce did acknowledge that he was not a crime scene expert, and that he based his conclusion on his experience at other crime scenes.

Dr. Springer testified that Jennifer had no other significant injuries that would suggest she had recently been in a fight: no injuries to her hands, the tips of her fingers or fingernails, or her knuckles. Regarding Cecil's claim that Jennifer had black eyes that week, Dr. Springer could not say with certainty whether Jennifer's left eye was bruised due to the gunshot wound, but her right eye was not bruised. Jennifer's toxicology report revealed that she had a

8

high amount of methamphetamine[2] and amphetamine[3] and a low amount of hydrocodone[4] in her blood.

Dr. Bill Smock, the police surgeon for LMPD[5], testified about the living forensic evaluation that was performed on Darrell six days after he was shot. The bullet that struck Darrell entered the back left top of his head, traveled left to right, downward, and slightly front to back. It stopped at the top right back of his head where it became lodged. Dr. Smock could not say with certainty what distance the bullet was fired from. He noted that there were triangular shaped tears and gaseous patterns beneath the tissue of the entrance wound that were consistent with a contact wound. However, the wound could have been fired from an intermediate range, 48 inches or less, based on the possible tattooing he observed. Because of the path the bullet took, it had to have been fired from above Darrell's head. Dr. Smock saw nothing to indicate that Darrell had defensive wounds or that he had recently struck a hard object, though he did have a very small circular wound on the first knuckle of his left hand. Neither of his eyes were bruised.

The firearm and toolmark examiner, Leah Collier, testified about the gun used in the shootings. She stated that it has two safeties: an automatic safety on the trigger and a standard manual safety on the side. Further, the trigger

---

[2] 3207 ng/mL.

[3] 853 ng/mL.

[4] 108 ng/mL.

[5] Louisville Metro Police Department.

required 4 ¾ pounds of pressure to fire. She said that the gun was designed to not fire accidentally, and, because it was a semiautomatic, the trigger had to be pulled with each shot fired.

Darrell also testified at trial. By that time, Darrell's condition had progressed enough that he could speak and had use of his arms, but he was still paralyzed from the waist down. He acknowledged that at the time of the shootings he had recently been released from prison after a four-year stint for a drug-related conviction. Darrell attested that he and Jennifer had been arguing the morning of the shootings because Jennifer accused him of having a boyfriend while in prison. Darrell said that Jennifer was screaming and throwing things, but they never got into a physical altercation. Jennifer wanted him to leave, so he packed his things. Jennifer then called him a cab and gave him $20. Photographic evidence showed Darrell's belongings were in boxes in the living room of the apartment near the door, and a twenty-dollar bill was later found in Darrell's shorts when they were removed at the hospital. Darrell had difficulty recalling all of the details from the morning of the shooting, but he remembered Greenwell shooting him, hearing the gunshot, and then blacking out. He believed Jennifer was shot after him because he could not remember her being shot.

Greenwell later testified on his own behalf, though Cecil did not. Greenwell's version of events during his testimony differed greatly from his previous statement to Det. Royce. Greenwell said that on the morning of the shootings he had been awake for a couple of days high on meth. He was lying

down watching TV when Jennifer started beating on the door of his apartment. Jennifer told him and Cecil that she and Darrell had been fighting, that Darrell was beating her, and that she was scared. Greenwell suggested that she call the police, but she did not want to. Jennifer asked Greenwell to go back to the apartment with her. He was reluctant but eventually agreed. He tucked his gun in his waistband before leaving his apartment because he did not know Darrell and because he was having problems with other people.

Greenwell, Cecil, and Jennifer went to Jennifer's apartment. At first, they were standing in the doorway, and Darrell was in the apartment cussing and yelling. Jennifer walked back into the bedroom and she and Darrell started fighting and throwing things. Greenwell and Cecil were still in the doorway at that point, and Cecil implored Greenwell to walk back to the bedroom and intervene. When Greenwell went back to the bedroom, Darrell

grabbed Jennifer, and Greenwell stepped between them. Then, Greenwell turned around and saw that Darrell had a gun, and Darrell proceeded to shoot Jennifer three times. Darrell then turned on Greenwell. By this point Greenwell's gun had fallen out of his waistband and onto the floor so he went to grab it, but then he and Darrell started wrestling. Greenwell therefore knocked Darrell over the end of the bed, accidentally grabbed Darrell's gun instead of his own, and shot Darrell. Greenwell then took his gun and Darrell's gun and fled. He was so upset afterwards that he had to pull over and let Cecil

11

drive.  In the car he told Cecil everything he could remember about the incident.

He said that he and Cecil did not call an ambulance for Darrell or Jennifer because Cecil "had warrants out on her" and they "had a bunch of dope on them," and "when you live the life [they] live you just don't get involved in stuff like that."

Based on the foregoing, it took the jury roughly an hour and a half to reach its verdict.  Greenwell was convicted of murder, attempted murder, and tampering with physical evidence, and Cecil was convicted of complicity to murder and complicity to attempted murder.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

Greenwell and Cecil's appeals, though consolidated, raise distinct issues. We will therefore address them separately.

## A. Greenwell

Greenwell presents two arguments to this Court that arise out of the same set of facts.  First, he alleges that his right to conflict-free counsel was violated because Cecil's attorney visited him in jail and discussed the case with him during trial.  Second, he asserts that the trial court erred by denying his motion for a mistrial based on the fact that Cecil's attorney visited him in jail during the trial.

On the morning of the fourth day of trial Greenwell's attorney, Heather Erskine, informed the court that Cecil's attorney, Brendan McLeod, had visited

Greenwell in jail the night before. Ms. Erskine said that Mr. McLeod did not have her permission to visit Greenwell and that she was uncomfortable because she had not had the opportunity to discuss what happened with Greenwell. Mr. McLeod claimed to have several letters from Greenwell asking Mr. McLeod to come and speak to him. The court said that they would take the issue up later.

Following that side bench, the Commonwealth presented two more witnesses and then rested. After directed verdict arguments were made, Ms. Erskine made a motion for a continuance. Ms. Erskine explained that she had since learned that Mr. McLeod visited Greenwell in the middle of the night, and that Greenwell was signed out for an hour. Her major concern was that, though Greenwell had not yet made a final decision about whether to testify, she had prepped him extensively prior to trial and believed he intended to testify. But, after speaking with Mr. McLeod, Greenwell no longer wanted to testify. Ms. Erskine's supervisor Jay Lambert entered an appearance to request an ex parte hearing on the matter. The trial court agreed.

During the ex parte hearing, Mr. McLeod acknowledged that Ms. Erskine sent him a letter six months prior to trial that stated that he did not have her permission to speak to Greenwell. Nonetheless, he said he had visited Greenwell that morning at about 3:30 to 4:00 a.m. and spoke with him substantively about the case. Mr. McLeod, a seventeen-year member of the Kentucky Bar, stated that he was not aware of the existence of Supreme Court

13

Rule (SCR) 3.130(4.2).[6]  When asked what the substance of his conversation with Greenwell was, Mr. McLeod said:

> a defense molded to be a joint defense because he seemed to have given up.  He wasn't responsive, the families of both sides were telling me to go and see [Greenwell] from very early on and I received letters from [Greenwell] that were down at the front at corrections and I received letters that were mailed to my home as well and he was asking me to come and visit him.  And I told [Ms. Erskine], I said no matter, I understand the letter, and I think this was before I got the letter but I said there's nothing she can do to stop me from going to see that client at that point.

Mr. McLeod stated that he went to see Greenwell solely at Greenwell's request.  Mr. McLeod acknowledged speaking to Greenwell about the substance of his defense and whether he would testify:

> **Lambert:** Did you discuss his testimony or whether he would testify or not or should testify?
>
> **McLeod:** Yes.  And this is what the basis was: I had a thrust going this way and he had a thrust going this way and we're together on this because the whole idea was that we wouldn't have to be here.
>
> We could've cut out early, we were getting offers down to ten without me even saying anything I just ignored them.  I could've got another 5 just to go away or whatever it is.  My client advised me that she wants to stay on board and go to trial with them and help out in any way we can and that's what we were doing up to this point.  And so whether you understand it or not, [Ms. Erskine] and I, she was attached to me at the hip at this point.  From the beginning we are in this fray to help [Greenwell] along because they have children together so that was the directive there.

---

[6] "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."  SCR 3.130(4.2).

Mr. McLeod also acknowledged speaking to Greenwell about whether Cecil would testify, a summary of the Commonwealth's evidence thus far, and what he could expect on cross-examination from both the Commonwealth and Mr. McLeod. Mr. McLeod alternated between saying he thought Ms. Erskine was doing a great job and disparaging her performance. He said he was not seeing a solidified defense, so he was "trying to bring everyone on board" and "shore it up." Since Ms. Erskine's opening statement, he had not seen anything the jury could latch onto as a viable defense; Ms. Erskine did not bring up the domestic violence element, but Mr. McLeod did, and he thought that was the better way to handle the case.

The trial court then asked Mr. McLeod and Cecil to leave the courtroom, leaving only Ms. Erskine, Greenwell, and Mr. Lambert. The court prefaced its questioning of Greenwell by telling him that whether or not he wanted to testify was solely his decision, but she needed to know if he was being inappropriately influenced. The questioning then commenced as follows:

> **Judge:** Has there been anything about Mr. McLeod and him visiting you, or, because I've watched during this whole trial, you and he are engaged in conversation a lot. Am I right?
>
> **Greenwell:** Yes ma'am.
>
> **Judge:** And a lot of times you're initiating it.
>
> **Greenwell:** Yeah.
>
> **Judge:** Okay. Do you feel like you have to do that?
>
> **Greenwell:** No ma'am.
>
> **Judge:** Okay. Do you feel like you're being pressured to do that?

15

**Greenwell:** No ma'am.

**Judge:** Do you feel like Mr. McLeod is overshadowing the advice of your attorney?

**Greenwell:** (pause) I mean, I don't know about that because this is the first time I've ever been through something like this.

**Judge:** Well, you understand that Ms. Erskine represents you and she's not going to divulge anything you say without your permission, right?

**Greenwell:** Yes ma'am.

**Judge:** And that Mr. McLeod represents Ms. Cecil.

**Greenwell:** Yes ma'am.

**Judge:** And so the fear is obvious. And of course the concern, the first thought is he's using what he gets from you to help her to bury you. Of course, that's not what we heard, but plus there are other rules that people have to follow if they're lawyers. But, my concern is that what you're doing in this trial and what you're going to do or not going to do is something that you've had time to think about, that it's your decision, and you're going to live with that decision and no one is forcing you, or promising you, or threatening you anything to either get you to testify or prevent you from testifying.

**Greenwell:** No ma'am.

**Judge:** It's your own free will.

**Greenwell:** Yeah.

**Judge:** Okay. Alright, and I want to make sure that free will is here tomorrow when the jury comes back. Alright, so if you're being threatened or coerced by anybody: my deputy, your lawyer, her lawyer, a family member, the Commonwealth, a detective, I need to know about it. And I need to know about it in the morning before we go to trial.

**Greenwell:** Yes ma'am.

16

Mr. Lambert said he believed the more pressing issue was the interference with the attorney-client relationship between Ms. Erskine and Greenwell. He emphasized that if Mr. McLeod had convinced Greenwell not to testify, it constituted material interference with that relationship. The court accordingly asked:

> **Judge:** Are you making whatever decision you're making because of Mr. McLeod and what he's said to you?
>
> **Greenwell:** No ma'am.
>
> **Judge:** Are you making whatever decision you're making because you've somehow changed your outlook on how your attorney is representing you?
>
> **Greenwell:** No ma'am, I think she's doing a good job.
>
> **Judge:** And if you're making your decision, whatever that is, on anything other than what you believe to be in your best interest you're going to let me know tomorrow?
>
> **Greenwell:** Yes ma'am.

The court then dismissed everyone for the day.

The next morning, Mr. Lambert entered certified records from the jail from the night Mr. McLeod visited Greenwell. The records showed that Mr. McLeod arrived at the jail at 2:28 a.m. and was in the attorney booth in Greenwell's housing unit by 2:32 a.m. He left that attorney booth at 3:19 a.m. and went to the attorney booth on Cecil's housing unit at 3:20 a.m. He spoke with Cecil until 3:48 a.m. He then returned to the attorney booth in Greenwell's housing unit at 3:49 a.m. and left the jail at 3:56 a.m. McLeod

acknowledged speaking to Greenwell the first time but denied speaking to him a second time.

Following this, Ms. Erskine moved for a mistrial due to Mr. McLeod's interference with her attorney-client relationship with Greenwell. The trial court readily agreed that Mr. McLeod's actions raised ethical issues. Nevertheless, she did not believe that his actions rendered the jury incapable of listening to, and properly considering, the evidence. She consequently denied the motion.

Mr. Lambert then made a motion to prevent Mr. McLeod from cross-examining Greenwell should he choose to testify. But, while the parties were making their arguments on the motion, Mr. Lambert informed the court that Greenwell told Ms. Erskine that he did not have a problem with Mr. McLeod cross-examining him and withdrew the motion.

Greenwell then testified as recounted in Section I of this opinion. Mr. McLeod's cross-examination of him was not adversarial. Mr. McLeod did not try to pick apart his story; he mostly asked him leading questions that were favorable to Greenwell's testimony. Following Greenwell's testimony, Ms. Erskine said nothing to the court about the substance of his testimony being altered from what they had originally planned, or that she had any suspicion that it had changed due to Mr. McLeod's interference. Nor did she ask for another ex parte hearing to determine whether Mr. McLeod had convinced Greenwell to alter his testimony.

18

Greenwell and Cecil were convicted on May 25, and Greenwell's sentencing was scheduled for August 6. On June 4, Greenwell's counsel filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative for a new trial. In relevant part, the motion asserted:

> 7. Also on May 24, it came to the attention of undersigned counsel for Mr. Greenwell that Brendan McLeod, the attorney representing Jodie Cecil, Mr. Greenwell's co-defendant, had met with Mr. Greenwell in the jail between the hours of 2 a.m. and 4 a.m. that morning, in the midst of the trial on the instant indictment. Said meeting occurred without the knowledge or consent of undersigned counsel; indeed, it occurred after Mr. McLeod was explicitly notified that he was not permitted to speak to Mr. Greenwell. An *ex parte* hearing on the record was conducted on this matter, during which Mr. McLeod conceded that he did not represent Mr. Greenwell; that he had privately visited Mr. Greenwell at the jail; that the two had discussed issues in the case such as how the defense was going, what the evidence looked like thus far, and whether or not Mr. Greenwell should testify; and that Mr. McLeod visited Mr. Greenwell despite having actual knowledge that he did not have the permission of counsel for Mr. Greenwell to communicate with her client or any authorization to conduct such a visit.

> 8. Throughout the course of the trial a number of specific issues prejudicial to Mr. Greenwell's interests arose out of Mr. McLeod's unethical contact with Mr. Greenwell. On May 25, Mr. Greenwell, through his counsel, moved for a mistrial due to the interference by Mr. McLeod in the attorney-client relationship between Mr. Greenwell and his counsel. The motion was denied. Counsel for Mr. Greenwell additionally moved that Mr. McLeod, based on his improper contact with Mr. Greenwell, be prohibited from cross-examining Mr. Greenwell. This Court never ruled on this motion because Bryan Greenwell inexplicably instructed undersigned counsel to withdraw the motion. **Notwithstanding the withdrawal of said motion, based upon the facts and circumstances which have subsequently come to the attention of undersigned counsel, it is hereby asserted that Mr. Greenwell should be granted a new trial or JNOV due to Mr. McLeod's improper contact with Mr. Greenwell and his subsequent cross-examination of him**. It is clear that Mr. Greenwell received legal advice from an attorney, Mr. McLeod, at a point in time when Mr. McLeod, as attorney for Mr. Greenwell's co-

19

defendant, was inherently conflicted.  Based upon the knowledge and belief of the undersigned, Mr. Greenwell acted on said advice to his detriment.  For these reasons, and on these grounds and the circumstances surrounding them, the defendant herein requests a new trial or JNOV.[7]

The facts and circumstances that counsel alleged had subsequently come to her attention were later expounded upon in affidavits filed with counsel's motion filed on July 23 to disqualify Mr. McLeod from further participation in the case, specifically participation in Cecil's sentencing, which had been moved to August 24.  That motion to disqualify asserted that "Mr. McLeod has, since May 24, 2018, and during all portions of Mr. Greenwell's trial, concurrently represented both Ms. Cecil and Mr. Greenwell."  Counsel asserted that this was a profound and fundamental conflict of interest that Greenwell did not, and could not, waive.

The affidavits by Ms. Erskine and Greenwell explained the "new" information that had come to light since Greenwell was convicted.  Ms. Erskine's affidavit states that Greenwell's trial testimony differed profoundly from the testimony she and Greenwell had prepared prior to trial, that Greenwell later told her that Mr. McLeod told him to tell that story when he testified, that she was unprepared for Greenwell's testimony to change so significantly, and that the change benefitted Cecil.  Specifically, if the jury believed that Darrell shot Jennifer, and Greenwell shot Darrell in self-defense,

---

[7] (Emphasis added.)

20

Cecil could not be convicted of complicity to anything because no crime had been committed by Greenwell.

Greenwell's affidavit states that Mr. McLeod indicated to him that he was more experienced than Ms. Erskine and that she generally was not handling the case correctly. Greenwell says that Mr. McLeod told him what to say when testifying, specifically: (1) that Greenwell took his gun to Jennifer's apartment, but did not use it; (2) that he saw Darrell in the act of shooting Jennifer when he got to the apartment; (3) that he and Darrell then struggled over Darrell's gun and Darrell was accidentally shot with it; and (4) that he panicked and left with both guns, and disposed of Darrell's gun in a pond. Regarding his representations to the trial court during the ex parte hearing that he had not been improperly influenced by Mr. McLeod, Greenwell stated:

> 7. These things were true at the time I spoke with Judge McDonald-Burkman. By the time I was called to testify, however, I had thought about what to do and changed my mind about the substance of my testimony. I felt like Mr. Mcleod, because of what he said was his greater experience, probably knew better what to do than Ms. Erskine, so when I testified, I said what he had told me to say. My testimony about seeing Mr. Wilson shoot Ms. Cain, about only then struggling with him, about two guns being involved and about leaving the scene with two guns was not true.

On August 6, the court held a hearing on the JNOV motion and scheduled a hearing on the motion for disqualification for a later date, but the court allowed the affidavits to be incorporated by reference. Greenwell's counsel's argument at the hearing was that, for practical and legal purposes, McLeod was Greenwell's attorney following the jail visit. Therefore, he was

21

representing Greenwell and Cecil at the same time and got Greenwell to change his testimony in a way that benefitted Cecil to his prejudice.

The Commonwealth responded that no attorney-client relationship was formed between Greenwell and Mr. McLeod, and that it is an ethical issue that needed to be taken up elsewhere. Further, the affidavits were not provided until after Greenwell was convicted. And Greenwell admitted in his affidavit that he thought about what Mr. McLeod told him to say, weighed his options, and ultimately Greenwell decided for himself to go with Mr. McLeod's story. But, since he was convicted, he regretted that decision. Greenwell explicitly and on his own volition withdrew the motion to have Mr. McLeod not cross-examine him. And nothing in the JNOV motion met the requirements of CR[8] 10.02,[9] because he did not demonstrate that he was denied a fair trial.

The trial court agreed with the Commonwealth and found:

> The McLeod issue is one of first impression, I thought by the end of my career I would be rid of things that surprised me. I'm surprised. It's not something I've had and I would venture that it's not something that any of you all have had. And I'm sorry Mr. McLeod elected not to be here for this. But he will be here for the hearing that is truly geared toward him. The conflict of interest issue, I think it exists, it's there, and if a conflict exists, does an attorney-client relationship exist? Good question, don't know. These are great law school questions. Did the conflict of interest or the attorney-client relationship, or however we're looking at that, did it rise to the level of prejudice to Mr. Greenwell to the extent that the verdict was affected? We've got to look at the evidence. Was the evidence "meh," was it milquetoast? Substantial. The

---

[8] Kentucky Rule of Criminal Procedure.

[9] "Upon motion of a defendant, the court may grant a new trial for any cause which prevented the defendant from having a fair trial, or if required in the interest of justice. If trial was by the court without a jury, the court may vacate the judgment, take additional testimony and direct the entry of a new judgment." CR 10.02(1).

22

forensic evidence in this case clearly showed, this is where it was extremely impactful, the positioning of the female and the lack of her blood anywhere on [Darrell], on his hands on anything near him. It was very telling, very strong and impactful that it could only have been Mr. Greenwell. Very impactful. That's the weight of that evidence, so the forensic evidence showed that. Would that evidence, the quality of it and the quantity of it, would it have mattered what story [Greenwell] told? It wouldn't have changed that evidence, it was very telling. It is what it is, as they say. Would this jury have believed anything he said that wasn't consistent with that pattern? I don't know. Would we be sitting here if they did believe him? No. But that's really not the issue. The issue is whether this whole McLeod issue, which is not going

away. It's going. Where, I don't know yet but it's not going away. Mr. Greenwell's issues though, I mean Mr. Greenwell has admitted he spoke to [McLeod], he listened to the guy, he decided to go with that story, he told me no one forced him, no one coerced him, he wasn't tricked, and he has never once appeared as incompetent or confused. At some point we are responsible for the decisions we make. I mean obviously Ms. Erskine didn't know about any of this. The McLeod issue has to have affected that jury, the evidence, and the way that I'm hearing it effected it was his testimony and what he said. So, either way, if he was going to testify to the version his lawyer thought he was going to testify to or the version that he actually did testify to. What effect did that have on this jury, the actual testimony? Obviously not much. What would the story that you told your lawyer you were going to say have on that jury? Well it still doesn't change the evidence at that scene. Physical evidence never changes. So the logical conclusion would be the same. So I do believe there was a conflict and/or an attorney-client relationship. I'm not making a finding on the McLeod [disqualification] issue. I'm making a finding based on whether or not it rises to the level of granting you a judgment notwithstanding the verdict or a new trial.

She accordingly denied the motion and proceeded to Greenwell's sentencing.

Later, on August 24, prior to Cecil's sentencing, the trial court heard arguments regarding the motion to disqualify Mr. McLeod from further participation in the case. After hearing arguments from both sides, the trial court declined to find that an attorney-client relationship was formed between

23

Mr. McLeod and Greenwell, and further found that Greenwell's testimony did not benefit Cecil to the prejudice of Greenwell. The court expounded:

> the court is faced with the issue of whether or not to grant a motion to disqualify you (Mr. McLeod) from any part of these proceedings including representing Ms. Cecil. In order for the court to do that I have to make a finding that you acted as an attorney for Mr. Greenwell thus creating a conflict for which there is no waiver, and then you'd go on from there. So, I'd have to make that finding. I'm not going to make that finding, I do not believe, Mr. Greenwell, his affidavit says what it says, I know it was sworn testimony, he's already committed perjury probably with what he's done. Was Mr. McLeod unethical, did he violate codes of professional conduct, is he going to be sanctioned or subject to sanction by the KBA?[10] Probably, I don't know, that's not what I'm dealing with. I'm dealing with whether he acted as an attorney for Greenwell, creating a conflict for which there was no waiver and therefore should be prohibited from representing Ms. Cecil in her sentencing. I do agree with Mr. McLeod: I could not make a finding that she benefitted from anything Mr. Greenwell said. She was with him. She was convicted in complicity. What he went down for, she was going to go down for too. The proof came in that way. But the court is not going to make a finding and can't, based on my assessment, that the conflict rose to a level of prejudice to Mr. Greenwell, it didn't benefit Ms. Cecil, she got more than what her [plea deal] offer was, so she obviously did worse by the trial. The forensics were so strong the court believes it would not have mattered what Mr. Greenwell testified happened. It was explained very well in the forensic part of the case and this jury could not have reached any other verdict. Motion to disqualify is denied.

While the foregoing facts are unusual and somewhat complicated, Greenwell asserts, in essence, a single issue. He asserts that his right to conflict-free counsel was violated. Specifically, that Mr. McLeod's jail visit with him created an attorney-client relationship between them, and their attorney-client relationship created an actual conflict of interest demonstrated by the

---

[10] Kentucky Bar Association.

fact that Greenwell's change in testimony benefitted Cecil to Greenwell's detriment.  And Greenwell did not, and could not, waive that conflict of interest.[11]  With that said, we now address the issue on the merits.

**(1) Greenwell's right to conflict-free counsel was not violated.**

Before this Court may address any of Greenwell's arguments regarding conflict of interest, a threshold issue must be addressed.  Mr. McLeod was not Greenwell's counsel of record.  Therefore, Greenwell and Mr. McLeod had to have formed an implied attorney-client relationship in order for Mr. McLeod to have conflict of interest.  In addition, the trial court ruled on this issue when it ruled on the motion to disqualify Mr. McLeod.  The trial court found that there was no attorney-client relationship formed between Greenwell and Mr. McLeod, and thus did not disqualify Mr. McLeod from representing Cecil.  Therefore, we must also bear in mind the proper standard of review.  A trial court's ruling on a motion to disqualify is a discretionary act and is subject to review for abuse of discretion.  We will not reverse the trial court's finding unless it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[12]  This Court does not believe that an implied attorney-client relationship was formed between Greenwell and Mr. McLeod, and we accordingly affirm.

---

[11] We find this issue to be preserved based on counsel's arguments before the trial court.  *See* Kentucky Rule of Criminal Procedure (RCr) 9.22.  Further, due to its importance, we decline to find that Greenwell waived this issue by allowing Mr. McLeod to cross-examine him, as the Commonwealth argues.

[12] *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

Though this is a unique set of circumstances, we must apply the well-established rules regarding how an attorney-client relationship may be formed. In particular, one of the touchstones of that test is the requirement that the potential client must reasonably believe that the attorney is seeking to undertake the representation:

> [A]n attorney-client relationship may be created as a result of a **party's reasonable belief or expectation**, based on the attorney's conduct, that the attorney has endeavored to undertake representation. Therefore, whether a party had a reasonable belief or expectation relating to the attorney's representation of that party's legal interests is a question of fact.[13]

In this case, Greenwell could not have reasonably believed that Mr. McLeod was endeavoring to undertake representation of him when he visited him in jail. Ms. Erskine had been Greenwell's counsel of record since October of 2017, seven months prior to trial. Ms. Erskine sent a letter to Mr. McLeod informing him he did not have her permission to speak to Greenwell six months prior to trial. So, presumably, Greenwell had never spoken to Mr. McLeod about his case until Mr. McLeod visited him in jail in the middle of trial. Further, by the time Mr. McLeod went to the jail to see Greenwell, they were at least three days into the trial, four days if voir dire is included. Greenwell had watched Ms. Erskine question potential jurors, make an opening statement, and cross-examine several witnesses solely on his behalf.

---

[13] *Pete v. Anderson*, 413 S.W.3d 291, 296 (Ky. 2013) (emphasis added) (internal quotations omitted). *See also Lovell v. Winchester*, 941 S.W.2d 466, 468 (Ky. 1997), *overruled on other grounds by Marcum v. Scorsone*, 457 S.W.3d 710 (Ky. 2015) ("Courts have found that the relationship is created as a result of the client's reasonable belief or expectation that the lawyer is undertaking the representation. Such a belief is based on the conduct of the parties.").

Indeed, with every witness Ms. Erskine would state that she was counsel for Greenwell. Likewise, Greenwell had watched Mr. McLeod question potential jurors, make an opening statement, and cross-examine witnesses solely on Cecil's behalf. Finally, and perhaps most damningly, Greenwell himself stated on the record that he understood that Mr. McLeod was not his attorney. As stated, during the ex parte hearing on the matter the following exchange occurred between the trial court and Greenwell:

> **Judge:** Well, you understand that Ms. Erskine represents you and she's not going to divulge anything you say without your permission, right?
>
> **Greenwell:** Yes ma'am.
>
> **Judge:** And that Mr. McLeod represents Ms. Cecil.
>
> **Greenwell:** Yes ma'am.

There is simply no basis to conclude that Greenwell could have reasonably believed that when Mr. McLeod visited him in jail, he was seeking to undertake representation of Greenwell.

Thus, while Mr. McLeod's actions may certainly be a violation of our ethical rules governing the conduct of attorneys, and are in no way condonable, we cannot hold that the trial court abused its discretion by finding that no attorney-client relationship was formed. Accordingly, because there was no attorney-client relationship between Greenwell and Mr. McLeod, there could not have been a conflict of interest. With no reason for this Court to address Greenwell's conflict of interest arguments, we affirm.

27

## (2) The trial court did not abuse its discretion by denying Greenwell's motion for a mistrial.

Greenwell also asserts that the trial court erred by denying his motion for a mistrial. A trial court's decision to deny a motion for mistrial is reviewed for abuse of discretion.[14] The test for abuse of discretion is whether the trial court's ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[15]

> A mistrial is an extraordinary remedy that should only be granted where there is a manifest necessity for such an action or an urgent or real necessity. Mistrial should only be used in those situations where an error of such import has been committed that a litigant's right to a fair and impartial jury would be violated if a new trial were not held.[16]

And, the nature of the error must be such that "*the prejudicial effect can be removed in no other way* except by grant of a mistrial."[17]

In this case, the jury was unaware of the issue that arose regarding Mr. McLeod, and the potential prejudice could have been remedied without granting a mistrial. The prejudice asserted by Greenwell's counsel was that McLeod had improperly influenced Greenwell to not testify. Or, in the alternative, that McLeod would gain an advantage over Greenwell during cross-examination by discussing the case with him if he chose to testify. Because Greenwell ultimately testified, the remedy for the potential prejudice was to

---

[14] *Kingrey v. Commonwealth*, 396 S.W.3d 824, 829 (Ky. 2013).

[15] *English*, 993 S.W.2d at 945.

[16] *Kingrey*, at 829.

[17] *Cardine v. Commonwealth*, 283 S.W.3d 641, 647 (Ky. 2009).

prevent Mr. McLeod from cross-examining Greenwell. This motion was made on Greenwell's behalf, but Greenwell instructed his attorney to withdraw the motion.

Because the jury was unaware of the issue, and because alleged prejudice was capable of being remedied absent a mistrial, a mistrial was improper. The trial judge accordingly did not abuse her discretion.

## B. Cecil

Cecil asserts that the trial court erred by denying her motion for directed verdict on both the complicity to murder and complicity to attempted murder charges against her. Specifically, she claims that the Commonwealth presented no evidence that she acted as either the principal or as an accomplice for either crime.[18]

As always, our analysis for this issue must begin with our well-established standard of review:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

---

[18] This issue was properly preserved by counsel. *See, e.g.*, *Commonwealth v. Jones*, 283 S.W.3d 665, 669 (Ky. 2009) ("[T]o preserve an error based upon the insufficiency of the evidence the defendant must move for a directed verdict at the close of the Commonwealth's proof and must renew his motion at the close of all evidence: at the end of the defense case (if there is one), or, if there is rebuttal evidence, as there was in this case, at the conclusion of rebuttal … the motion must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove.").

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence.[19]

A trial court's denial of a motion for directed verdict is a discretionary act and is therefore reviewed for abuse of discretion. We must therefore affirm the trial court's ruling unless it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[20]

Preliminarily, we note that the jury was instructed under both theories of complicity contained in KRS[21] 502.020. In relevant part, KRS 502.020 provides:

(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

---

[19] *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)).

[20] *English*, 993 S.W.2d at 945.

[21] Kentucky Revised Statute.

30

(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or

(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result[.]

As this Court has discussed numerous times, KRS 502.020 offers two separate and distinct theories under which someone may be found guilty by complicity. Subsection (1) provides for "complicity to the act," "which applies when the principal actor's *conduct* constitutes the criminal offense."[22] This means that "a person can be guilty of 'complicity to the act' under KRS 502.020(1) only if he/she possesses the intent that the principal actor commit the criminal act."[23] In contrast, subsection (2) describes "complicity to the result," "which applies when the *result* of the principal's conduct constitutes the criminal offense[.]"[24] Stated differently,

> a person can be guilty of "complicity to the result" under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with "the kind of culpability with respect to the result that is sufficient for the commission of the offense," whether intent, recklessness, wantonness, or aggravated wantonness.[25]

Cecil asserts that the Commonwealth presented no evidence that would allow her to be convicted under either theory of complicity.[26] In essence, she

---

[22] *Tharp v. Commonwealth*, 40 S.W.3d 356, 360 (Ky. 2000). *See also, Beaumont v. Commonwealth*, 295 S.W.3d 60, 68-71 (Ky. 2009), *Harper v. Commonwealth*, 43 S.W.3d 261, 265 (Ky. 2001).

[23] *Tharp*, 40 S.W.3d at 360.

[24] *Id.*

[25] *Id.*

[26] We also note that, presumably due to the wording of her jury instructions, Cecil also argues that the Commonwealth presented no evidence that she acted as principal to these crimes. We agree, but decline to address that argument because the

31

claims that her only participation in the crimes was to ask Greenwell to intervene in a domestic violence situation to protect Jennifer, which does not constitute complicity to the murder or attempted murder that occurred thereafter. We disagree with Cecil's representation of the evidence. In a light most favorable to the Commonwealth, while reserving credibility determinations to the jury, the evidence as a whole was sufficient to allow a reasonable trier of fact to find Cecil guilty of complicity to murder and complicity to attempted murder.

Preliminarily, we note that this Court has been very clear that a conspiracy within the meaning of KRS 502.020 does not require "detailed planning and a concomitant lengthy passage of time."[27] And, that the existence of such a conspiracy can be proven by circumstantial evidence.[28] Further, and perhaps most importantly in the case at bar, "a person's state of mind may be inferred from actions preceding **and following** the charged offense."[29]

---

Commonwealth's theory of the case from the beginning was that Cecil only acted in complicity.

[27] *Commonwealth v. Wolford*, 4 S.W.3d 534, 540 (Ky. 1999).

[28] *Id.*

[29] *Harper*, 43 S.W.3d at 265 (emphasis added) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997). *See also, Meredith v. Commonwealth*, 164 S.W.3d 500, 502 (Ky. 2005) ("Though the evidence against [Meredith] is circumstantial, his intent can be 'inferred from the act and surrounding circumstances.'"), *Wilson v. Commonwealth*, 601 S.W.2d 280, 282 (Ky. 1980) (The conduct of the accused both prior to and subsequent to the actual killing is admissible as evidence tending to show facts from which intent can and should be inferred.").

To begin, even by Greenwell and Cecil's version of events, Cecil was the one that asked Greenwell to get involved in whatever was going on in Darrell and Jennifer's apartment. There was also overwhelming evidence that Jennifer and Darrell's injuries were intentionally inflicted. Jennifer was shot three times in the head, and all of the bullets entered the left side of her head and exited through the right side. Two of those shots were fired from three feet or less away, and two out of the three shots would have been individually lethal. At least one of those bullets was fired into her skull when she was already on the floor. Darrell was shot in the back of the head from either an intermediate distance or while the gun was pressed against his skin and had to have been fired from above him based on the bullet's trajectory. The gun used in the shootings had both an active and a passive safety mechanism and was designed not to fire accidentally during, for example, a struggle between Darrell and Greenwell over the gun.

Neither Jennifer's nor Darrell's body had any indication that they had recently been physically violent with one another, as Cecil and Greenwell claimed. Darrell testified that, while he and Jennifer were arguing, it never became physical. Further, Greenwell never asserted that Darrell had a gun or that Darrell was the person who shot Jennifer until trial. And, Darrell himself testified that he was certain that Greenwell was the person that shot him.

Cecil acknowledged that she was standing in the doorway of Jennifer and Darrell's apartment when the shootings occurred, that she heard at least two gunshots, and that she saw Darrell's body shaking on the bed. And, Greenwell

33

testified that he told Cecil what he could remember about the incident in the car as they were fleeing the scene. Yet, Cecil did not call an ambulance for Darrell or Jennifer because she had warrants out for her arrest. This Court has previously held that abandoning a victim that a defendant believes has been mortally wounded is "certainly subject to a reasonable inference that they intended an intentional death."[30]

Further, Cecil participated extensively in the aftermath of the shootings. She immediately fled from the scene with Greenwell and eventually had to drive the getaway car when Greenwell became ill. It is well-established that "proof of flight to elude capture or to prevent discovery is admissible because flight is always some evidence of a sense of guilt."[31] Not only did they flee, but they seemingly attempted to create an alibi: they went to a casino for the next five to six hours "just to be somewhere." Cecil went back to her apartment only once, in the middle of the night, to retrieve her personal effects and never returned notwithstanding the fact that she had already paid her rent for the entire month of May.

Later, during Cecil's interview with Det. Royce, she lied when she denied any involvement in the shootings and even attempted to place blame on a third party. She instantly became frightened when she learned that Darrell had survived. And, though interviewed separately, Cecil and Greenwell's

---

[30] *See Murphy v. Commonwealth*, 50 S.W.3d 173, 179 (Ky. 2001).

[31] *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218 (Ky. 2003) (internal quotations omitted).

34

statements to Det. Royce were so striking similar—from their initial denial to their ultimate admissions—that it would not be unreasonable for the jury to believe that they had previously fabricated a story to tell law enforcement if they were ever caught.

As discussed, to survive a motion for directed verdict, the Commonwealth had to present more than a mere scintilla of evidence that Cecil shared Greenwell's intent to kill Jennifer and Darrell[32] under KRS 502.020(1). Or, in the alternative, under KRS 502.020(2), the Commonwealth had to present more than a mere scintilla of evidence that Cecil acted with the culpability with respect to the result that was sufficient for the commission of the offense; in this case, aggravated wantonness. Based on the foregoing evidence, we cannot hold that the trial court abused its discretion by finding that there was sufficient evidence to submit the complicity charges against Cecil to the jury.[33] We accordingly affirm.

### III.    CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

---

[32] *See* KRS 506.010(1)(a).

[33] *See also Harper,* 43 S.W.3d at 265-66, *Wilson,* 601 S.W.2d at 281-82.

35

COUNSEL FOR APPELLANT, BRYAN GREENWELL

Joshua Michael Reho
Leo Gerard Smith
Louisville Metro Public Defender


COUNSEL FOR APPELLANT, JODIE MARIE CECIL

Steven Goens
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General